GARY M. RESTAINO
United States Attorney
District of Arizona
WALLACE H. KLEINDIENST
MARY SUE FELDMEIER
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
wallace.kleindienst@usdoj.gov
mary.sue.feldmeier@usdoj.gov
Attorneys for Plaintiff

☒ FILED   ☐ LODGED

**Apr 26 2022**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-21-03136-TUC-JGZ(BGM) |
| Plaintiff, | |
| vs. | PLEA AGREEMENT |
| Koreasa M. Williams, | |
| Defendant. | |

The United States of America and the defendant agree to the following disposition of this matter:

PLEA

1.      The defendant agrees to plead guilty to Counts 1 and 6 of the Indictment, which charge the defendant with Class C felony violations of 18 U.S.C. § 1343, Wire Fraud.  The remaining counts of the Indictment will be dismissed at sentencing.

Elements of the Offense

2.      The elements of the offense are as follows:

(a)      The defendant devised or intended to devise a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises; and

(b)      For the purpose of executing the scheme above, the defendant caused to be transmitted by means of wire communication in interstate commerce any writings, signs, signals, pictures, and sounds

1

<u>Maximum Penalties</u>

2    3.    The defendant understands that the maximum penalties for the offenses to

3    which she is pleading guilty are a fine of $250,000, a term of 20 years imprisonment, or

4    both, and a term of three (3) years supervised release.

5    4.    The defendant agrees restitution in this case is mandatory pursuant to 18

6    U.S.C. § 3663A and further agrees pursuant to 18 U.S.C. §3663A(a)(3) to make restitution

7    to the victim identified in the indictment, J.L.F., and victim W.C.'s heirs, for all losses to

8    include losses arising from counts dismissed and charges not prosecuted as well as all

9    relevant conduct in connection with those counts and charges.

10    5.    The defendant agrees to pay any fine imposed by the Court unless the

11    defendant establishes the applicability of the exceptions contained in § 5E1.2(e) of the

12    Sentencing Guidelines.

13    6.    Pursuant to 18 U.S.C. § 3013, the defendant shall pay a special assessment

14    of $100.00 per felony count.  The special assessment is due and payable at the time the

15    defendant enters the plea of guilty, but in no event shall be paid later than the time of

16    sentencing unless the defendant is indigent.  If the defendant is indigent, the special

17    assessment will be collected according to the provisions of Chapters 227 and 229 of Title

18    18, United States Code.

19

<u>STIPULATIONS, TERMS AND AGREEMENTS</u>

20

<u>Agreements Regarding Sentencing</u>

21    7.    <u>Guideline Calculations</u>: Although the parties understand that the Guidelines

22    are only advisory and just one of the factors the Court will consider under 18 U.S.C.

23    § 3553(a) in imposing a sentence, pursuant to Rule 11(c)(1)(C), Fed. R. Crim. P., the parties

24    stipulate and agree that the following guideline calculations are appropriate for the charges

25    for which the defendant is pleading guilty:

26

27    Base Offense Level: The guideline for a violation of 18
U.S.C. § 1343 is USSG §2B1.1. The base offense

28    level is 7. USSG §2B1.1(a)(1).                                    7

| | |
|---|---|
| Specific Offense Characteristics: Fourteen levels are added because the loss exceeded $550,000 but was less than $1,500,000. USSG §2B1.1(b)(1)(H). | +14 |
| Victim Related Adjustment: The defendant knew or should have known the victim of the offense was a vulnerable victim. In this case, the victim was an elderly individual (DOB June 1939) (age 80 at time of offense). Therefore, two levels are added. USSG §3A1.1(b)(1). | +2 |
| Adjustment for Role in the Offense: Two levels are added as the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. The defendant abused her position as a registered insurance agent. USSG §3B1.3. | +2 |
| Adjustment for Obstruction of Justice: Two levels are added as the defendant Produced false, altered or counterfeit documents or records during the official investigation of this offense when she produced a forged "counter-signed" note to her attorney in response to the government's request for the alleged note and produced false information to the US Probation officer regarding said "loan" during Presentence investigation in CR-19-01276-TUC-JGZ(BGM) (*Williams I*). USSG § 3C1.1. | +2 |
| Commission of Offense While on Release:  Three levels are added because a statutory sentencing enhancement under 18 USC 3147 applies as the defendant committed this offense while on pretrial release in CR-19-01276-TUC-JGZ(BGM) (*Williams I*). USSG §3C1.3. | +3 |
| Chapter Four Enhancement: None. | 0 |
| *Acceptance of Responsibility: USSG §3E1.1(a) & (b).\** | 0 / -3 |
| Total Offense Level: | 30 / 27 |

*\*Acceptance of Responsibility*: The parties disagree on the applicability of adjustments for Acceptance of Responsibility pursuant to USSG §3E1.1(a) & (b) and hereby stipulate and agree that both parties are permitted to argue for or against these adjustments, with applicability to be determined by the Court at the time of sentencing. The Court's determination on this matter shall not be a basis for either party to withdraw from the plea agreement.

8.      Sentencing Agreement:  Pursuant to Rule 11(c)(1)(C), Fed. R. Crim. P., the government and the defendant stipulate and agree that the applicable guideline range, depending upon the Criminal History Category and Acceptance of Responsibility, as

determined by the Court at the time of sentencing, is as follows, and that the defendant shall not be sentenced to more than the mid-range for the appropriate Criminal History Category/Total Offense Level, as follows:

*Total Offense Level 27 - If Acceptance of Responsibility is Applied*
Criminal History I: 70-87 months imprisonment (mid-range 78 mos)
Criminal History II: 78-97 months imprisonment (mid-range 87 mos)
Criminal History III: 87-108 months imprisonment (mid-range 97 mos)
Criminal History IV: 100-125 months imprisonment (mid-range 112 mos)
Criminal History V: 120-150 months imprisonment (mid-range 135 mos)
Criminal History VI:  130-162 months imprisonment (mid-range 146 mos)

*Total Offense Level 30 – If Acceptance of Responsibility is NOT Applied*
Criminal History I: 97-121 months imprisonment (mid-range 109 mos)
Criminal History II: 108-135 months imprisonment (mid-range 121 mos)
Criminal History III: 121-151 months imprisonment (mid-range 136 mos)
Criminal History IV: 135-168 months imprisonment (mid-range 151 mos)
Criminal History V: 151-188 months imprisonment (mid-range 169 mos)
Criminal History VI: 168-210 months imprisonment (mid-range 189 mos)

a.      The defendant may not move for any adjustments in Chapters Two, Three or Four of the Sentencing Guidelines or any "departures" from the Sentencing Guidelines, with the sole exception that the defendant may argue for application of Acceptance of Responsibility pursuant to USSG §3E1.1(a) & (b) and the provisions of paragraph 7*, above.

b.      The defendant may argue for a variance under 18 U.S.C. § 3553(a) in support of a sentence request below the stipulated range in this agreement, and the government may oppose the requested variance. The government, however, will not withdraw from the agreement if the defendant argues for, and the Court grants, a variance below the stipulated range in this agreement.

c.      The parties stipulate and agree that the sentence imposed in this case shall run concurrent to the sentence the defendant is presently serving in CR-19-01276-TUC-JGZ(BGM).

d.      The defendant agrees to mandatory restitution pursuant to 18 U.S.C. § 3663A in the amount of $1,338,652.00 to the victim identified in the indictment, J.L.F., and in the amount of $50,000.00 to the heirs of victim W.C., to include losses arising from

counts dismissed and charges not prosecuted as well as all relevant conduct in connection with those counts and charges.

9.     The defendant understands that if the defendant violates any of the conditions of the defendant's supervised release, the supervised release may be revoked.  Upon such revocation, notwithstanding any other provision of this agreement, the defendant may be required to serve a term of imprisonment or the defendant's sentence may otherwise be altered.

10.    The defendant and the government agree that this agreement does not in any manner restrict the actions of the government in any other district or bind any other United States Attorney's Office.

11.    The defendant understands and agrees to cooperate fully with the United States Probation Office in providing (a) all criminal history information, i.e., all criminal convictions as defined under the Sentencing Guidelines; (b) all financial information, i.e., present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution; (c) all history of drug abuse which would warrant a treatment condition as part of sentencing; and (d) all history of mental illness or conditions which would warrant a treatment condition as part of sentencing.

12.    If the Court, after reviewing this plea agreement, concludes any provision is inappropriate, it may reject the plea agreement pursuant to Fed. R. Crim. P. 11(c)(5), giving the defendant, in accordance with Fed. R. Crim. P. 11(d)(2)(A), an opportunity to withdraw her guilty plea.

<u>Restitution</u>

13.    Pursuant to 18 U.S.C. § 3663A, the defendant specifically agrees to make restitution in the amount of $1,338,652.00 to the victim identified in the indictment, J.L.F., and restitution in the amount of $50,000.00 to the heirs of W.C., arising from charges not prosecuted, as outlined in the above Agreements Regarding Sentencing section.

14.     The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

15.     The defendant agrees that she will waive her right to appeal any order of the district court relating to restitution.

<u>Assets and Financial Responsibility</u>

16.     The defendant agrees that she will truthfully complete and return a financial affidavit that will be provided to her by the Financial Litigation Program of the United States Attorney's office within 45 days after the completed change of plea hearing. The defendant further agrees she shall (i) make a full accounting of all assets, including real and personal property in which the defendant has any legal or equitable interest; (ii) permit the U.S. Attorney's Office to immediately obtain the defendant's credit reports in order to evaluate the defendant's ability to satisfy any financial obligation that is or might be imposed by the court; (iii) make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Program, for any purpose [as well as the financial condition of all household members (including but not limited to that of a spouse or child)]; (iv) cooperate fully with the government and the probation officer to execute such documentation as may be necessary to secure assets to be applied to restitution owed by the defendant. The defendant agrees to permit the probation officer to provide to the U.S. Attorney's Office copies of any and all financial information provided by the defendant to the U.S. Probation Office; (v) not (and shall not aid and abet any other party to) sell, hide, waste, spend, destroy, transfer or otherwise devalue any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures); and (vi) submit to an interview in which the defendant will fully and truthfully answer all questions regarding the defendant's past and present financial condition. The defendant agrees that any failure

to comply with the provisions in this paragraph that occurs prior to sentencing will constitute a violation of this plea agreement.

17.     Pursuant to 18 U.S.C. § 3613, the defendant agrees that all financial obligations imposed by the court, including restitution, shall be due immediately upon judgment, shall be subject to immediate enforcement by the government, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect any periodic payment schedule). If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program pursuant to a payment schedule to be determined by the court. The defendant understands that any schedules of payments imposed by the court, including schedules imposed while the defendant is incarcerated or on supervised release, are merely minimum schedules of payments and not the only method, nor a limitation on the methods, available to the government to enforce the judgment.

<u>Waiver of Defenses and Appeal Rights</u>

18.     Provided the defendant receives a sentence in accordance with this plea agreement, the defendant waives (l) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentencing-including the manner in which the sentence is determined, and any sentencing guideline determinations. The defendant further waives: (1) any right to appeal the Court's entry of judgment against defendant; (2) any right to appeal the imposition of sentence upon defendant under Title 18, United States Code, Section 3742 (sentence appeals); (3) any right to appeal the district court's refusal to grant a requested variance; (4) any right to collaterally attack defendant's conviction and sentence under Title 28, United States Code, Section 2255, or any other collateral attack; and (5) any right to file a motion for modification of sentence, including

under Title 18, United States Code, Section 3582(c) (except for the right to file a compassionate release motion under 18 U.S.C. § 3582(c)(1)(A) and to appeal the denial of such a motion).  The defendant acknowledges that this waiver shall result in the dismissal of any appeal or collateral attack the defendant might file challenging his/her conviction or sentence in this case.  If the defendant files a notice of appeal or a habeas petition, notwithstanding this agreement, defendant agrees that this case shall, upon motion of the government, be remanded to the district court to determine whether defendant is in breach of this agreement and, if so, to permit the government to withdraw from the plea agreement. This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics Op. 15-01 (2015)).

19.     If the defendant's guilty plea is rejected, withdrawn, vacated, or reversed by any court in a later proceeding, the government will be free to prosecute the defendant for all charges as to which it has knowledge, and any charges that have been dismissed because of this plea agreement will be automatically reinstated.  In such event, the defendant waives any objections, motions, or defenses based upon statute of limitations, the Speedy Trial Act, or the Sixth Amendment to the Constitution as to the delay occasioned by the later proceedings.

### Plea Addendum

20.     This written plea agreement, and any written addenda filed as attachments to this plea agreement, contain all the terms and conditions of the plea. Any additional agreements, if any such agreements exist, shall be recorded in a separate document and may be filed with the Court under seal. Accordingly, additional agreements, if any, may not be in the public record.

### WAIVER OF DEFENDANT'S RIGHTS AND FACTUAL BASIS

#### Waiver of Rights

I have read each of the provisions of the entire plea agreement with the assistance of counsel and understand its provisions.  I have discussed the case and my constitutional

and other rights with my attorney. I understand that by entering my plea of guilty I will be giving up my right to plead not guilty; to trial by jury; to confront, cross-examine, and compel the attendance of witnesses; to present evidence in my defense; to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination; all with the assistance of counsel; to be presumed innocent until proven guilty beyond a reasonable doubt; and to appeal.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

I have been advised by my attorney of the nature of the charges to which I am entering my guilty plea. I have been advised by my attorney of the nature and range of the possible sentence, and that I will not be able to withdraw my guilty plea if I am dissatisfied with the sentence the court imposes.

My guilty plea is not the result of force, threats, assurance or promises other than the promises contained in this agreement. I agree to the provisions of this agreement as a voluntary act on my part, rather than at the direction of or because of the recommendation of any other person, and I agree to be bound according to its provisions. I agree that any Sentencing Guidelines range referred to herein or discussed with my attorney is not binding on the Court and is merely an estimate.

I agree that this written plea agreement contains all the terms and conditions of my plea and that promises made by anyone (including my attorney) that are not contained within this written plea agreement are without force and effect and are null and void.

I am satisfied that my defense attorney has represented me in a competent manner.

I am not now on or under the influence of any drug, medication, liquor, or other intoxicant or depressant, which would impair my ability to fully understand the terms and conditions of this plea agreement.

I further agree that the following facts accurately describe my conduct in connection with the offense to which I am pleading guilty and that if this matter were to proceed to trial the government could prove the elements of the offense beyond a reasonable doubt:

1
2
3
4

At all times relevant to the charges in this case, I was listed with the Arizona Department of Insurance as the registered agent and owner of GLAM Insurance Services LLC (GLAM), located in Tucson, Arizona, which did business as Williams and Associates. I held a valid Arizona Health and Life Insurance Agent's license and was in the business of selling life, accident and health insurance policies and annuity policies from various insurance companies.

5
6
7

In this capacity, sometime in September 2018, I developed a client, J.L.F., who was born in 1939. In October 2018 I convinced J.L.F. to roll over his IRAs into three annuities that I placed for him. I also prompted him to cancel eight (8) life insurance policies for the purpose of investing the proceeds into annuities.

8
9
10
11
12
13
14
15

In November 2018, I became aware that the Arizona Department of Insurance and the FBI were investigating me for the conduct outlined in CR-19-01276-TUC-JGZ(BGM) ("annuity fraud scheme"), so I hired an attorney (Lawyer A) and devised a plan to pay back the annuity fraud victims in the hopes of avoiding cancelation of my insurance license and/or criminal charges. I told Lawyer A I had a "rich uncle" in Green Valley who would loan me the necessary funds. I then told J.L.F. that I was ready to invest the funds from his previous life-insurance cash-outs into an annuity and instructed him to write a $1,000,000 check to Lawyer A. I told J.L.F. that Lawyer A worked for my annuity company.  On January 10, 2019, I met with J.L.F. at his residence and he wrote the $1,000,000 check as I instructed, although he inserted the word "investment" in the memo line. On that same day I delivered the check to the offices of Lawyer A, thus causing the check to be deposited in Lawyer A's JP Morgan Chase Bank IOLTA account and causing the associated interstate electronic transmissions. (**Count 1**)

16
17
18
19
20

I did not invest J.L.F.'s $1,000,000 in an annuity or any other financial products for J.L.F. Instead, between January 22, 2019 and February 20, 2019, I directed Lawyer A to use $863,935.87 of J.L.F.'s funds to issue nine (9) checks to M.K., S.K., G.B., M.N., M.L., and R.C., all victims of the earlier annuity scheme. I provided Lawyer A with instructions as to the amounts each victim was to be paid. Then the law firm issued checks to the victims, drawn on the firm's IOLTA Account and mailed them to the victims without a cover letter or other explanation.

21
22
23
24
25
26

Around this same time, GLAM, my husband, and I were defendants in a civil lawsuit pending in Pima County Superior Court. Trial was scheduled to commence in March 2019, and there was no longer enough money left in Lawyer A's IOLTA account to fund the proposed settlement. Therefore, I asked J.L.F. to make a $100,000 investment in my annuity company that J.L.F. understood was to be part of what he believed was his previous $1,000,000 investment. I instructed J.L.F. to write this second check to Lawyer A under the guise that Lawyer A worked for my annuity company. I then delivered the check to Lawyer A's firm where it was deposited and used to fund the civil settlement and pay my attorney's fees for the civil suit and my defense before the Arizona Department of Insurance.

27
28

In May 2019, I was indicted in the annuity fraud scheme and placed on pretrial release to the court, with several conditions, including that I not commit new crimes. On June 20, 2019, under false pretenses, I convinced J.L.F. to write a third check to Lawyer A, this one for $120,000. On or about

June 25, 2019, I delivered this check to the law firm, causing it to be deposited into the law firm's IOLTA account and the funds to be used for my representation in the criminal case for the annuity fraud scheme.

Thereafter, I devised a scheme to defraud J.L.F. of an additional $118,652, via a non-profit entity called *In Its Time*, incorporated by my husband in the State of Arizona on July 8, 2019, as a ministry business. I knew J.L.F. had a charitable foundation ("F.F.F.") with a significant amount of funds in it, and I convinced him that he could take money from the F.F.F. and place it in an account associated with a religious name (the name The Sacred Juniper Society was eventually agreed upon) from which J.L.F. could then withdraw the funds to care for his adult disabled daughter. I told J.L.F. that since *The Sacred Juniper Society* (*TSJS*) was not yet formed, J.L.F. could transfer the funds to my husband's ministry account (*In Its Time*) where they would be held for J.L.F.'s daughter's benefit and until *TSJS* could be formed.

On August 23, 2019, my husband opened a checking account for *In Its Time*. between September 4, 2019, and November 19, J.L.F. wrote four checks from the F.F.F., to *In Its Time*, totaling $124,252.00 and gave them to me: $600, $23,652, $50,000, and $50,000. I, or someone under my direction, deposited these checks into the *In Its Time* JP Morgan Chase Bank account. The second check for $50,000 (**Count 6**) was deposited by me or with my knowledge and consent on November 19, 2019, thus causing the interstate electronic transmissions associated with this deposit.

J.L.F. intended all of these checks to *In Its Time* to be the initial draw down of the funds in his charitable foundation and to be held in trust until *TSJS* was established. Instead, except for $5600 used to pay for J.L.F.'s daughter's housing and dental, I used the remaining F.F.F. funds ($118,652) in the *In Its Time* account to mine and my family's use and benefit including thousands of dollars in ATM and over the counter cash withdrawals, supermarket expenses, convenience store expenses, Infiniti car payments, cable fees, movie theater purchases, and donations to the religious ministry in North Carolina I am affiliated with, my local church, and a local charity. Except for approximately $3240, all the money deposited into the *In Its Time* account came from J.L.F., and by January 2020 the account was in the negative. I never opened a bank account in the name of *TSJS* or transferred any of the $118,652 remaining from the funds J.L.F. gave me to an account for his daughter's benefit.

I agree that I fraudulently obtained a total of $1,338,652.00 from J.L.F.

J.L.F. eventually learned that I was under indictment for the annuity fraud scheme and in December 2019 contacted the FBI and told them I had taken his money from him under false pretenses. Lawyer A was confronted with this information and I assured Lawyer A that the money was a loan from J.L.F. who I was not actually related to, but rather called "uncle" as a term of endearment. I also provided Lawyer A with a loan document for the first $1,000,000 from J.L.F. on which I had forged J.L.F.'s signature. Lawyer A asked me that same day, December 11, 2019, via email whether it would be alright to share this document with the prosecutor, to which I replied "Yes. I don't see why not." This production of the forged "loan" document to the prosecutor was an attempt to obstruct my prosecution for the theft of the money from J.L.F.

I also agree that another client, W.C., who is now deceased, gave me checks totaling $50,000 between 2016 and 2018 for the purpose of purchasing annuities, but instead I converted the funds to my own use. As part of this agreement, I agree to a restitution order of $50,000.00 to W.C.'s heirs.

4/28/22
Date

Koreasa M. Williams
Defendant

## DEFENSE ATTORNEY'S APPROVAL

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Rule 11, Fed. R. Crim. P., the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea, including the defendant's waiver the right to appeal. No assurances, promises, or representations have been given to me or to the defendant by the government or by any of its representatives which are not contained in this written agreement. I concur in the entry of the plea as indicated above and on the terms and conditions set forth in this agreement as in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Rule 11, Fed. R. Crim. P.

4/22/22
Date

Saúl M. Huerta
Attorney for Defendant

- 12 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## GOVERNMENT'S APPROVAL

I have reviewed this matter and the plea agreement. I agree on behalf of the United States that the terms and conditions set forth are appropriate and are in the best interests of justice.

GARY M. RESTAINO
United States Attorney
District of Arizona

Digitally signed by MARY SUE
FELDMEIER
Date: 2022.04.14 16:01:08 -07'00'

_____April 14, 2022_____
Date

Wallace H. Kleindienst
Mary Sue Feldmeier
Assistant U.S. Attorneys

- 13 -